UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>vs.<br><br>Earnest Lee Miller,<br><br>        Defendant. | CR 11-763-TUC-JGZ (JR)<br><br>**REPORT AND RECOMMENDATION** |

In a four count Superseding Indictment filed on August 17, 2011, Defendant Earnest Lee Miller was charged with conspiracy to possess with intent to distribute marijuana and possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841, possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 922, and possession of a firearm by a convicted felon in violation of was a convicted felon in possession of ammunition in violation of 18 U.S.C. §§ 922 and 924.  On February 19, 2013, Miller filed a Motion to Suppress All

1

Evidence Gathered Pursuant to Search Warrants and Fruits Thereof (Doc. 248). The Government filed a response (Doc. 260) and Miller filed a reply (Doc. 268). The Motion was heard by Magistrate Judge Rateau on May 28, 2013. Defendant Miller was present at the hearing and was represented by counsel. The Government presented the testimony of Homeland Security Investigations Special Agents David Slagle, Eric Feldman and Ian Cruikshank and Pima County Sheriff's Department Deputy Gary Halkowitz. Defendant Miller testified on his own behalf and also presented the testimony of Michael Kleving from Interstate Investigative Services. The witnesses were examined, cross-examined, and questioned by the Court. Having considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that Defendant Miller's Motion be denied.

## I.     FINDINGS OF FACT

On the morning of February 5, 2011, Pima County Sheriff's Department Detective Gary Halkowitz was working with the Border Patrol canine unit at the Border Patrol Checkpoint located at milepost 22 of Arivaca Road. (Tr. 52-53.) A vehicle, which was towing a trailer, approached the checkpoint and Detective Halkowitz recognized it as belonging to Defendant Earnest Miller. (Tr. 53.) Detective Halkowitz was familiar with Miller's vehicle because he had 15 or 20 documented encounters with him and additional undocumented encounters. (Tr. 55.) Halkowitz was also familiar with the properties Miller frequented, including a property on which Miller lived which was located at 36335 Arivaca Ranch Road. (Tr. 55.)

1       A canine alerted to the trailer prompting agents to drill a hole in it and
2 discover a large amount of marijuana in a hidden compartment. (Tr. 53.) The
3 occupants of the vehicle, Rachel Mayber and Vanessa Martinez, both of whom were
4 known to Detective Halkowitz as living on Defendant Miller's properly, were
5 arrested, informed of their *Miranda* rights, and questioned by Detective Halkowitz.
6 (Tr. 11, 54.) The two were then transported to the Border Patrol station in Tucson.
7 (Tr. 11, 54.)

8       At approximately 10:00 a.m. on February 5, 2011, Homeland Security
9 Investigations Agent David Slagle was informed by Border Patrol agents that the
10 vehicle and a trailer belonging to Defendant Miller had been stopped at the Border
11 Patrol checkpoint on Arivaca Road. (Tr. 10-11.) Detective Halkowitz transported
12 Mayber to the Tucson Station so Agent Slagle could interview her. (Tr. 55.) Based
13 on that interview, Agent Slagle believed that there was probable cause to apply for a
14 search warrant for Defendant Miller's property. (Tr. 11-12.)

15       Agent Slagle then consulted with his supervisor, Agent Eric Feldman, who
16 was familiar with the area where Miller's property was located, and together they
17 prepared an application for a search warrant. (Tr. 12, 72.) During the preparation of
18 the application, Agents Slagle and Feldman consulted with Detective Halkowitz, who
19 had been at the scene of the arrest and had interviewed Mayber and Martinez. (Tr.
20 13, 56.) Halkowitz, who had worked in the area around Arivaca where Defendant
21 Miller's property was located and who was familiar with the location and the
22 structures on the property, provided Slagle with an overview of the property and the

3

1 property address. (Tr. 13-15, 56-57.) Agent Slagle obtained additional information
2 from Tucson Border Patrol intelligence agents and from Rachel Mayber, who
3 identified the location of the property on Google Maps. (*Id.,* Tr. 16, 33.)

4     After getting the United States Attorney's approval, Agent Slagle
5 telephonically applied for the warrant by calling United States Magistrate Judge
6 Estrada and submitting the application via email. (Tr. 14-15.) Judge Estrada
7 verbally approved on the warrant at 9:17 p.m. on February 5, 2011. (Tr. 15.) After
8 Agent Slagle was given verbal approval of the warrant, he telephoned Agent Eric
9 Feldman, who had traveled from Tucson and was at the property, at about 9:28 p.m.
10 (Tr. 18-19.) After getting a signed copy of the warrant by fax from the judge at 9:37
11 p.m., Agent Slagle made copies and left for Arivaca at about 9:50 p.m. (Tr. 15, 20;
12 Ex. 1 (Search and Seizure Warrant with fax stamp time)).[1]

13     On the face page of the warrant, the address of Defendant Miller's property is
14 indicated as 36335 South Arivaca Ranch Road. (Ex. 1.) Attachment A to the
15 warrant, which is a list of items to be seized, also indicates that the property address
16 as 36335 South Arivaca Ranch Road. (*Id.*, Attach. A.) However, on attachment B to
17 the warrant, which is a satellite photo and description of Miller's property, the
18 address is identified as 36335 South Universal Ranch Road. (*Id.*, Attach. B.) Agent

---

20 [1] Agent Slagle also testified that, while on the phone with Magistrate Judge Estrada,
21 the judge told him to complete a second copy of the warrant and write the judge's name on the signature line. Agent Slagle did so but mistakenly dated the second warrant February 7, 2011. (Tr. 17-18, Ex. 2 (second warrant).) Agent Slagle filed
22 both warrants, but only served the first (Ex. 1) on Defendant Miller. (Tr. 18.)

4

1  Slagle explained that the Arivaca Ranch Road address is correct and that he
2  inadvertently substituted Universal Ranch Road, which is a nearby road, on
3  Attachment B. (Tr. 15-16.)
4  After transporting Mayber to Tucson, Detective Halkowitz proceeded to
5  Defendant Miller's Arivaca Ranch Road property to assist in securing the property
6  and stationed himself to the rear of the location. (Tr. 60.) While at the property, he
7  was informed by another deputy that two suspects were leaving the front entrance to
8  the property in a Dodge Durango. (Tr. 61.) When Detective Halkowitz got to the
9  front of the property, Defendant Miller and the man with him, Mario Noriega, had
10 already been detained. Defendant Miller was handcuffed with his hands in front of
11 him and was sitting in the backseat of a Pima County Sheriff's Deputy's vehicle with
12 his infant child. (Tr. 61, 94.) Detective Halkowitz took Mr. Noriega, read him his
13 *Miranda* rights, and questioned him. (Tr. 62.) He then went to the patrol vehicle in
14 which Miller was detained and Miller requested he get a bottle for his child, which
15 Halkowitz retrieved from the Durango. (*Id.*)
16 While Slagle was applying for the warrant, Agent Feldman left Tucson and
17 traveled to Miller's Arivaca property. (Tr. 73.) When he arrived at the property,
18 Agent Feldman saw several marked sheriff's units on the scene, as well as vehicles
19 belonging to Homeland Security Investigations agents parked on the road outside the
20 property. He met with all the law enforcement officers on the scene and explained
21 that Agent Slagle was in the process of obtaining the search warrant, described to the
22 agents what buildings on the property would be searched and described how the

1  search would be conducted. (Tr. 74-75.) Then, after receiving notice at about 9:30
2  p.m. from Agent Slagle that the warrant had been signed, Agent Feldman conducted
3  a last minute head count, reminded the officers of safety precautions, and
4  commenced searching the property. (Tr. 75-77.)

5  When Agent Slagle arrived in Arivaca at about 10:35 p.m. with a hard copy of
6  the warrant, the search had already commenced. (Tr. 20.) When he arrived,
7  Defendant Miller was still detained in the backseat of a Pima County Sheriff's
8  deputy's car. He remained handcuffed and his infant child was still with him. (Tr.
9  21-22.) Although he does not know the precise time, Agent Slagle recalls that he
10 gave a copy of the warrant to Miller and informed him about the search. (Tr. 21-22,
11 26-27, Ex. 1 (search warrant).) According to Defendant Miller, he was not given a
12 copy of the warrant, but found it later lying in the driveway leading to his house. (Tr.
13 116.) Agent Slagle then proceeded to assist in the search, which Agent Feldman had
14 paused after the property was cleared and recommenced when Agent Slagle arrived
15 with the hard copy of the warrant. (Tr. 23, 78.)

16 A few days later, on February 8, 2011, Agent Slagle applied for a second
17 warrant to search Defendant Miller's property at 36335 South Arivaca Ranch Road.
18 (Tr. 23.) The second warrant includes an Attachment B similar to that used on the
19 first warrant except that the incorrect Universal Ranch Road address is interlineated
20 with the correct Arivaca Ranch Road address. (Tr. 24.)

21
22

## II. CONCLUSIONS OF LAW

Miller moves to suppress the evidence seized in the search, arguing that the search warrant lacked particularity, was not properly served, and was served after 10 p.m.

### A. Particularity

The warrant described Miller's property with sufficient particularity despite the fact that Agent Slagle inadvertently substituted "Universal Ranch Road" for "Arivaca Ranch Road" on Attachment B of the warrant. The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, . . . and particularly describing the place to be searched . . . ." U.S. Const. amend. IV. Addressing the warrants description of the place to be searched, the United States Supreme Court held, "It is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503 (1925). In *United States v. Mann*, 558 F.3d 982 (9th Cir. 2009), the court stated:

> The test for determining the validity of a warrant is whether the warrant describes the place to be searched with 'sufficient particularity to enable law enforcement officers to locate and identify the premises with reasonable effort,' and whether any reasonable probability exists that the officers may mistakenly search another premise.

*Id.* at 876; *see also United States v. Brobst*, 558 F.3d 982 (9th Cir. 2004).

The Ninth Circuit has recognized that "[t]he necessary specificity of the description will differ as between urban and rural areas and depends heavily upon the factual circumstances of each case." *Mann*, 389 F.3d at 876 (citations and internal

7

1 quotation marks omitted).  Additionally, the district court is directed to take into
2 account the knowledge of the officer executing the warrant.  *See id.* at 876-77
3 (holding that the warrant was sufficiently particular, regardless of misstated address,
4 because (1) two of the agents executing the warrant personally knew which premises
5 were intended to be searched; (2) the misaddress of "Lower Deer Creek" rather than
6 "Upper Deer Creek" could not have caused any confusion because the road
7 referenced in the warrant only traveled to Upper Deer Creek; (3) the address was
8 reasonable for the rural location; and (4) the premises that were intended to be
9 searched were those actually searched); *United States v. Turner*, 770 F.2d 1508, 1511
10 (9th Cir. 1985) (holding the warrant was sufficiently particular in that it (1) described
11 the house to be searched with great particularity; (2) the address was reasonable for
12 the location to be searched; (3) the house had been under surveillance; (4) the warrant
13 was executed by an officer who knew which premises were intended to be searched;
14 and (5) the premises that were intended to be searched were those actually searched).

15 Under these standards, the facts in the present case satisfy the particularity
16 requirements under the Fourth Amendment.  The face pages to the warrant and the
17 warrant application both accurately reflect the intended premises.  And although
18 Attachment B contains the incorrect address, any confusion that may have resulted in
19 the search of the wrong property was allayed by a number of factors.  Primary
20 amongst these factors is the description and photo of the property that are also
21 included in Attachment B.  The photo depicts the trailers and structures that existed
22 on the property at the time of the search.  Additionally, the description specifically

1 describes the size of the property, a double wide trailer with a red brick adobe
2 addition, and a barn structure that were to be searched, and additional single wide
3 trailers that were rented to others that were not to be searched. When the description
4 and photo are considered with the fact that Detective Halkowitz was familiar with the
5 property and Mr. Miller, and the fact that the intended property was actually the
6 property searched, there was clearly sufficient particularity to support the search of
7 Miller's residence.

### B. Service

Miller, relying on *United States v. Gantt*, 194 F.3d 987 (9th Cir. 1999), argues that the evidence obtained in the search must be suppressed because the warrant was not present and served when the search commenced. The Government responds that *Gantt* was overruled by the Supreme Court in *United States v. Grubbs,* 547 U.S. 90 (2006). Miller contends that the *Grubbs* decision constitutes dicta and should not affect the validity of *Gantt*. However, the *Grubbs* decision suggests otherwise. There, the Supreme Court, in reversing the Ninth Circuit explained that:

> neither the Fourth Amendment nor Rule 41 of the Federal Rules of Criminal Procedure imposes such a requirement. See *Groh v. Ramirez*, 540 U.S. 551, 562, n. 5, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004). "The absence of a constitutional requirement that the warrant be exhibited at the outset of the search, or indeed until the search has ended, is . . . evidence that the requirement of particular description does not protect an interest in monitoring searches." *United States v. Stefonek*, 179 F.3d 1030, 1034 (7th Cir. 1999) (citations omitted). The Constitution protects property owners not by giving them license to engage the police in a debate over the basis for the warrant, but by interposing, *ex ante*, the deliberate, impartial judgment of a judicial officer between the citizen and the police, and by providing, *ex post*, a

> right to suppress evidence improperly obtained and a cause of action for damages.

*Id.* at 99 (internal quotation and citation omitted). Thus, the *Grubbs* opinion clearly states that neither the Fourth Amendment nor Rule 41 impose a requirement that the warrant be presented prior to the search. The Court recommends that the District Court find that Agent Slagle's service of the warrant upon his arrival at the scene was not improper and does not support the suppression of the evidence seized during the search of Miller's property.

### C.     Commencement of the Search

Miller's final argument is that the search was conducted after 10 p.m. at night and thus required good cause. Under Rule 41(e)(2)(A)(ii), Fed.R.Crim.P., a warrant must be executed during daytime, which is defined as the hours between 6 a.m. and 10 p.m., "unless the judge for good cause expressly authorizes execution at another time." Noncompliance with this rule requires suppression only when "(1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *United States v. Stefanson*, 648 F.2d 1231, 1235 (9th Cir. 1981).

Here, the evidence quite clearly shows that the search was commenced prior to 10:00 p.m. Agent Slagle testified that Judge Estrada verbally approved on the warrant at 9:17 p.m. (Tr. 15.) After he was given verbal approval of the warrant, Agent Slagle telephoned Agent Eric Feldman. (Tr. 18-19.) This rendition of events

is supported by the warrant itself which is endorsed with the 9:17 p.m. approval time and also reflects that the warrant was faxed from the judge at 9:37 p.m. The timeline is further confirmed by Agent Feldman's testimony that he got a phone call at 9:28 from Agent Slagle indicating that the warrant had been signed, and that he then conducted a last minute head count, reminded the officers of safety precautions, and commenced searching the property. (Tr. 75-77.) A search that begins in the "daytime," that is before 10:00 p.m., and continues through the night, is not unreasonable under Rule 41. *See United States v. Zhang*, 634 F.Supp.2d 1040 (C.D. Cal. 2009) (collecting cases). As such, based on these facts, the Court finds that the search did not violate Rule 41(e)(2)(A)(ii).

## III.   RECOMMENDATION

Based on the foregoing, the Magistrate Judge **RECOMMENDS** that the District Court, after its independent review, **deny** Defendant Miller's Motion to Suppress (Doc. 248).

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have fourteen (14) days

1   within which to file a response to the objections.  If any objections are filed, this
2   action should be designated case number: **CR 11-0763-TUC-JGZ**.  Failure to timely
3   file objections to any factual or legal determination of the Magistrate Judge may be
4   considered a waiver of a party's right to *de novo* consideration of the issues.  *See*
5   *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003)(*en banc*).

    Dated this 20th day of June, 2013.

    _____
    Jacqueline M. Rateau
    United States Magistrate Judge

12